We'll continue with 5-15-0051 in the interest of L.K., a minor. And we have Mr. Atterbury and Mr. Daley. Mr. Atterbury? Hi. This is the court, counsel. I'm Dennis Atterbury, attorney for the respondent, appellant. This is an interlocutory appeal for obtaining a goal in a juvenile abuse case. The goal is changed to substitute care pending termination of criminal rights. Could you speak a little slower because it's kind of mumbling together and I can't hear you, so I apologize. No, it's okay. For my ears, but they're old. Okay, sure. There are basically four issues. One, whether the trial court erred in changing the goal to substitute care pending termination of criminal rights when there's been no adjudication against the father. Two, whether the trial court erred in changing the goal to substitute care in direct conflict with the refusal order of July 17, 2014. Three, whether the trial court erred in failing to take into consideration the reasonableness of the service plan. And four, whether the trial court erred in failing to give the respondent his appeal rights as to the shelter care area. We can see that adjudication is as to the child, not the parent. However, the lack of adjudication or addressing the allegation against the father goes directly to the heart of this matter. In order to have a change of goal, the court is required to balance certain factors, including the reasonableness of the service plan as well as the implementation of the service plan. It seems that your client had a lot of trouble with the implementation of the service plan. Correct. And I think this is form over substance, which is- Form over substance to attend counseling and visitation. Right. The key is that the service plan needs to be such that the completion is necessary to correct the condition which brought the minor into care. So you have to go back into why did the minor come into care? And there was four allegations that was in the petition. Three were against the mother for drug abuse, and one was against the father. And the one that was against the father said that there was-that the father knew that the respondent mother was not in a condition to care for the minor on December 25th, 2012, and left the minor alone with the respondent mother anyway. Well, that was not the case. And everybody agrees that that's not-that that allegation can't be proved. That's not- Aren't you arguing matters, counsel, that are predisposition? That are predisposition? Wasn't there a dispositional order entered in this case? Correct. And was your client not there at that hearing? I believe he was there, Your Honor. I got appointed. But you're saying he was at the dispositional hearing. Pardon? You think he was there at the dispositional hearing. I believe so. But, oh, no, at the adjudication hearing? He was not there at the adjudication hearing. Isn't it true that he wasn't there at either hearing? At what hearing? Either the adjudication or the disposition. I'm not for sure about the disposition. I know he wasn't there at the adjudication or hearing. Now- Why not? I'm not sure. I mean, this is a big decision. I understand. What has transpired up to that point may have created a very big frustration at that point. I'm not for sure. So one of the issues that your client seems to have is he doesn't like the fact that the CFS is involved. Well- He's angry. Yes and no. When this incident occurred, he's the one who called the cops. He's the one that got with DCFS, got with the DCFS investigator, and went to the order of protection. And the judge asked, is he fit to care for the child? And the DCFS investigator said yes, while the judge later indicated she wasn't under oath. I don't think that matters. She didn't think yes. So he was working with them. It's only after that hearing that they get a new DCFS investigator, and they guess immediately about heads. But, Justice, if I could finish answering your question right quick, I apologize. It is a dispositional issue regarding prior disposition. But then it becomes whether or not one of the factors is reasonableness of the service plan. And we're actually attacking the reasonableness of the service plan as the court must determine whether or not the reasonableness of the service plan and determine whether or not to change goals. And we're attacking that. There's nothing I can do about not appealing prior. And keep in mind, he did ask the court, how do I appeal the shelter care hearing? And the judge outright refused to give him any appeal rights at that time. Didn't the judge conduct another shelter care hearing? So he did have that opportunity? He did both. Yes. And I think he was. And wasn't that a contested hearing? It was a contested hearing, yes. But he, Mr. Conifer, wanted to know his appeal rights, and he's already been told by the judge, I'm not going to give you those rights. And it creates an environment. The shelter care order is not a final and appealable order, is it? No, but he should at least be told that he, that it's an appealable rights. Doesn't he have a lawyer? Whether or not he has appeal rights or not appeal rights, he should have been told, you do not have appeal rights. Doesn't he have a lawyer? Wasn't there a lawyer appointed? And he actually sent a letter to the court saying, I need a new attorney, one that will fight for me. And that's also in the record as well. In fact, two years later, the judge recuses himself and prior to recusing himself, appoints me and says, we need to get this guy, you can tell the frustration of the order. We need to give this guy a fair chance. I'm going to appoint a new person. I'm going to recuse myself and get this guy a chance. The very next hearing, we're going to termination, which is not really giving him a second chance. When he asked, what are my appeal rights, because he did not like this, this was not a final and appealable order, is that correct? Correct, but the judge didn't explain that. He just outright said. Are you are you saying that it was error for the trial judge not to give him legal advice? Because that's basically what he was asking for. I mean, it's not a situation where, as final and appealable orders seem a criminal matter and you're mandated by rule to explain appeal rights. He was basically asking the trial court for legal advice. Wasn't he? I believe he was asking what his rights were at that time. And it's regardless of what that answer was that created that answer. Regardless of not the substance of that answer, but his actual answer was a combative situation, which basically told Mr. Conacher we're in a combative situation. And it probably helped lead to the fact that he stopped really trying to participate in the process. Now, that doesn't mean that. Keep in mind, there's that psychiatrist at the state that said that he can parent because of the antisocial disorder, which goes right to the fact that he's going to have conflicts with people of authority. Let me ask you this question. Isn't it true that every order, including the shelter care order and every subsequent order has in it this clause? The parents are ordered to cooperate with DCFS. The parents must comply with the terms of the service plan and correct the conditions which require the minor to be in care or risk termination of their parental rights. Correct. Now, with regards to that, though, let's talk about the service plan. In the service plan, he completed the parenting classes, the substance abuse portion. When the police came down to Christmas Day, they knew that the biological mother was under the influence. They made sure he wasn't under the influence before they gave the child to him. Now, saying that, DCFS required him to go through drug alcohol testing. He did so on February 4th, 2013. No service recommended. They didn't like that. On November 5th, 2013, they did. Reminding you, Justice Gates, if you slow down a little bit, it is hard to keep up. I apologize. On February 4th, 2013, there was no services recommended. DCFS did not like that. Another referral was done November 5th, 2013. No services were recommended. Then they did a third one, took three referrals before somebody would recommend the services plan. Same thing with the mental health evaluation. September 23rd, 2013, he goes, he does the evaluation. No services recommended. November 20th, 2013, they request a second one. That one says he can parent. He just can't co-parent because of this disorder. And what is that disorder? It's an antisocial disorder, she said. Antisocial personality disorder. She says it interferes with his ability to co-parent. It does not mean he can't parent. He just can't co-parent. It interferes with his ability to co-operate in the courtroom, it appears. Correct. But that's not parenting. That's dealing with the director of the courts. It interferes with his ability to co-operate with DCFS, it appears. Yes. And as the 4th District held an interest versus Harrison, they held that co-operating with DCFS or failure to not co-operate with DCFS does not, per se, make the parent fit. Now, in that case, they're saying that the person is confused as to why are they coming to care in the first place and what can they do to rectify the situation. He's doing some services and when he does those services and he complies and no recommendations is the outcome, they then do another referral until there is a recommendation. He's like, what can I do to satisfy this requirement? But he's only seen his child. I mean, his attempts to visit with his own son, who he's trying to win back, are very meager attempts. Yes. Is there a transportation issue? How far do they live from the jail where they visit? Location issues is a good example. It has to be during a certain time period. It has to be before 5 when he's working. It has to be during the week when he's working. There's times when he wasn't working. But he goes from — But it's very sparse. Right. He goes from being able to have his kid, his child, to going to do his supervising stations at a jailhouse lobby. It's not conducive to being able to parent a child. Well, whether we agree with you or not on that issue, the question is why he would only visit his son two times out of 30 or whatever it was. I mean, it's not very much. I just threw out those numbers. I'm looking for them. But it's very sparse. It's very sparse. I mean, he doesn't show up for counseling. They say, okay, then we're going to terminate you. Then he says, okay, I'm going to do it. We start it over again. He does it for a little while. As I understand, this change in goal is not a termination of parental rights, is it? They are changing it. Substantive care pending termination of parental rights, yes. But he still has the opportunity, if he follows the service plan, to get his son back. Is that true? In theory, probably. In practice, no. Okay. But with that stated, all services that are required by the agency stop upon the change of goal. Now, again, I see that the court is asking a lot of questions about form versus substance. Go back to day one. Did he do what was necessary to protect that child on Christmas Day? He called the cops. He would have gotten more protection. He was doing it. He got DCFS. He was doing everything right. And now DCFS, the petition is filed, DCFS comes in, and now he's put on the defensive, and immediately, and it's not just a slight defensive, it is a total 180 to where you're taking the child, sheltered her at night and taking it, you know, we're going to keep him under continuous nurse supervision. No. We're going to take the child totally away from you, supervise visits only. Totally 180. He has other kids that he has with another marriage. There is no issue. He can parent. The original DCFS investigator told the judge he can parent. The psychiatrist said he can parent, just not co-parent. This man is going to lose his children, and I don't think he will be able to complete the service plan. I don't think he will. I just think his personality disorder is preventing him from doing so, and he's just so frustrated with the system that he is not going to be able to do that. But this is a case where prior to coming into the case, he was doing everything as a parent should, and then his interaction with DCFS and the judge is what's causing, and his failure to do the service plan is what's causing him to lose the child, not his actual parenting child, but trying to perform the service plan. And I submit to the court- Let me stop you there just a moment because we've run out of time, but you will have a chance to speak with us again under the vote. And we apologize, but we do try to keep before it begins to time away. Thank you. Okay, Mr. Daly. Welcome. Good morning, Your Honors. May it please the court and counsel. By way of advance disclaimer, this case was originally briefed by Rebecca McCormick of the office. She's since retired. I took over the case given the fact that this is a juvenile case,  The record is already in the chamber, so I'm sort of limiting my argument based upon the briefs and the facts contained therein. So you don't want us to ask you any questions? I want you to ask me lots of questions. The disclaimer is if I don't know, don't get me fired afterwards. Just wanted to get that out. I want to talk about the respondent's first issue first. Admittedly, when I first read the argument, I was a little confused, because there was not any citations of authority inside of it. It wasn't clear. It had sort of a first blush kind of jurisdictional whiff to it, that there wasn't an order of adjudication that involved neglect on the part of or abuse on the part of the father. This was only for his mother. This is the argument today. I haven't read the respondent's reply. I think it's a little clear to me what the point they made is. In fact, if I'm mischaracterizing what the point is, they'll certainly correct me when it comes up here. But I think that the relationship that is trying to be made here is that if there was not evidence of neglect produced against the father at the adjudicatory stage, then essentially DCFS or LCFS, if you will, is not empowered to the degree that maybe they did in this case to order certain things as part of the service plan. And that's where a respondent then tries to draw in the change of service plan goal to, you know, there's that list of things that the court needs to take into consideration, one of those being the appropriateness of the service plan. And the argument is that, well, if you look back to the adjudicatory stage, you know, he didn't really do anything wrong, so therefore, dot, dot, dot, you know. So why should DCFS be involved if there's no order as to the father? I'm glad you asked that question. I think it's a matter of looking at the procedural construct of what you have here. And I have to sort of go through this step by step. A, when there's a suspicion or an allegation of abuse or neglect, DCFS or some authority will intervene. What happened in this case is there was an emergency shelter care unit. Testimony was presented, and I think relevantly here, testimony was presented that DCFS should take, at least at that point, temporary custody of the minor. Number one, because of the abuse that was alleged against the father, but also because there was a determination based upon, you know, facts, you know, criminal history, et cetera, that it was not an appropriate home environment for the minor to go to the father. Then the next procedural step is that there's a petition for adjudication of worship. We go to an adjudicatory hearing. Now, the only thing that happens there is there has to be a finding of abuse or neglect, and as the respondent, I believe, conceded, that that goes towards abuse of the child, not necessarily the actions of any particular parent or parents. That's essentially a jurisdictional step to lead to the next step, which is the dispositional hearing. That's obviously the most critical step here, because at the dispositional hearing, the court then receives evidence to make a determination of whether it's in the best interest of the child, the minor, that it be made award to the court. If it's made award to the court, then the court then has the power to award the custody of the minor, and it's almost usually the case to the Department of Children and Family Services. So when you get to that point, the home environment, if you will, or the parenting capability, that just goes towards the mother to whom the petition for adjudication of neglect was directed, but the child's home environment, because it's either got a child with a defective parent or it's got to be placed as award to the court. And so it really isn't relevant in terms of what we're dealing with here. What's not relevant? That the father was not named in the adjudicatory order as a neglectful or abusive parent. And that's because the dispositional hearing takes precedence over that. It's not so much precedence as it is the next jurisdictional step. Right, evidence being heard. Correct. The court's found that there's an abused minor. Now we have to look at the child's home environment to determine what do we do next. Do we give the child to the father? Do we give the child to someone else, or do we make DCFS an award to the court? And that's where the father's particularities come into the background. Now what's important about that is when we move forward, is obviously the next stage of all this is reunification. And reunification is going to occur now that DCFS is the custodian and the court is the warden of the minor, which is where the court is empowered to enter those permanency orders because the child is a warden of the court. The father's progress or lack of progress in completing service plans and dictates of DCFS with regards to counseling, visitation, there's lots of different things that come into play here. So I think that when you look at it from that perspective, I think when we take it from the beginning to where we're at right now, everything is done appropriately and procedurally and correctly. So I don't think that the fact that they have the minors was not named because of abuse specifically by the father changes anything, nor does it change the fact that a order of DCFS, excuse me, a service plan of DCFS is appropriate. Whether or not the father was accused of abuse at the adjudicatory stage, the father is the father and therefore part of the big picture that DCFS has to take into consideration. So I don't think that anything diminishes the appropriateness of the service plan here. In that regard, the service plan, I think, based upon the respondent's history of violence, and you'll see when you read the record, at least what I believe the record will say, that there's a lot of instances here where there was definitely an antagonistic relationship of the respondent with LCFS, with the court, with his attorneys, with everybody, to the point that there's a notation in the record that extra security was brought into the courtroom whenever the respondent made an appearance. There was testimony that DCFS workers and LCFS workers were afraid of him, that he had made fatal threats, left a message of imitating gunshots, had followed a worker and a foster parent home, thus causing one of the first set of foster parents to back out for understandable nervousness about what the respondent did. So now, the next argument that the respondent raises is that the goal change is inconsistent in conflict with Judge Long's recusal order. Judge Long recused himself. It appears by all appearances here in this case that the basis for the recusal is that we had a very tense and antagonistic situation in this case. Judge Long did make reference to the respondent's, at that point, lack of progress and cooperation with LCFS, and felt that probably, this was in July of 2014, and felt that they asked, it might be better for everyone concerned, now that he's getting a new attorney appointed, that the judge recuse himself and get another judge in who's not going to be so, you know, give it up against the respondent for things that had happened in the past. There didn't appear to be any other reason there's no evidence of a conflict of interest or agreement or propriety about it. So basically, we're going to give the respondent a second chance. Now, the respondent argues that, well, the state then seeks a change in the permanency plan to substitute care and determination, and this is just sort of a quick and unexpected turn of events. Well, it actually happened six months after the recusal. And when you look at the record, you'll see that in that six-month time period, that while the respondent had started to do things a little bit better with regards to attending and counseling and getting assessments, there were still significant problems involved, particularly with visitation. Justice Gates accurately noted that visitation was sporadic or meager, I believe, was the characterization. That's been the way it is throughout the entire case. There was still a resistance to the need for counseling at that stage. But it's important also to keep in mind that this case is not about that six-month time period. This case is about the whole time period. You'll see in this record that there was a six-month time period earlier in this case where the respondent had done nothing. Six months, did nothing. Now, it's interesting and significant because if the state were to, say, proceed to a petition to terminate parental rights, they need only prove any nine-month time period for lack of progress. Am I correct, counsel, that there has yet been no petition filed? There has not yet been a petition filed. That's correct. Certainly, that's the anticipation given the change of permanency order. But as Justice Gates also pointed out very accurately, that this is an interim order that's entered for the purposes of the best interest of the child. It's not a final order with respect to the parent's parental rights. It does change the posture of the case. And that's essentially a procedural step to put everyone on notice exactly where we're heading in this case. But it doesn't mean nor can the respondent simply just give up. It also doesn't mean that the respondent makes extraordinary efforts to complete that which was required of them, that that won't be taken into consideration by the court. And before any termination can happen, isn't it true that the court must find that it is in the best interest of the child that the rights be terminated, and the burden of proof is on the state to prove that? Is that right? People, let's back up for a second. Actually, the termination stage focuses on the parents, not the best interest of the child. Well, the termination, I'm talking about the second stage. The second stage, okay. The first stage, of course, is the finding first of unfitness by clinical evidence, most of which is what's been focused on here today. But even if that's found, there can be no termination without a finding that it is in the child's best interest. That's absolutely correct. So this, no matter what happens today, the father still has opportunity. Is that right? I would hope that, sort of like ringing the bell, this is your last shot. Well, it's better than that, isn't it? Well, I suppose it depends on where you're at in the case. As I pointed out, there's already enough evidence probably to determine if they have gone into termination right away. But we haven't heard any. That's not before us. That's not before you. I guess my point is that even if you were to do a complete turnaround from this point forward, the court would still at a future time be empowered to terminate parental rights based upon what happened in the past. Not until they find that it is in the child's best interest. That is correct. But if it turns out, when we get to the second stage, that the best interest stage, that his recent progress changes the complexion, then you're absolutely correct. So it is important. What we're at here is that he could make a titanic effort to correct these things. It will be very important for the court's factual consideration should the state proceed to petition to terminate parental rights. But what we're seeing right now at the present time is that he hasn't really done anything to give any confidence to the court. For a minor who's been in the care of DCFS or the state for two and a half years, to believe that we're heading to a quick turnaround would be means. And that's why there's not, against the manifest way of the evidence for the court, to at least enter this interlocutory, this interim order to change a permanency to substitute care pending termination. Now, this is where AI is based upon the history of the case to this point, and the judges articulated statements about what the respondent has not done to this point. So I believe that the court's order was correct, and that this court should affirm the change of permanency to substitute care pending termination. Does the court have any questions? Nothing to figure. Thank you, Mr. Daly. Roberto? If I may? Okay, you may. I disagree with the fact that counsel indicated that Mr. Conacher, that this is not about Mr. Conacher not abusing his child, and that it's about him not following the service plan. I think it should be about whether or not he can parent this child as opposed to follow a service plan. I believe that is form over substance. And while I appreciate the Justice's comments that this is not over, for practicality purposes, it is. I've never seen in all my practice any case that has gone where the case has been proven unfit, and then the reasonableness of the child has been the opposite. So I think this is his last chance to do this at this particular moment. Again- So you believe that if your client does not make a dramatic change, does not start visiting with his child on a regular basis- I see in the record that he asked for Wednesdays so that he could get off of work, and then out of nine Wednesdays, he only made two. So I'm asking you, do you believe that if he doesn't make a dramatic change, that regardless, as Justice Moore says, the best interest of the child is lost on that issue? I will go one step further. I think even if he makes a drastic change, it does not matter. So it's over. It's over. Correct. And it's over when the situation- when he's the one who brought people's attention and called the cops. He's the one that got the order of protection. He's the one that did everything he could to protect his child based upon his actions. Then, he's now going to lose his job because of his actions after the petition. He did not cooperate with DCFS. I can't, in good faith, argue that he cooperated. He did do some service plans, but as he did the service, the service, and no recommendations were ordered, DCFS wasn't happy with it, ordered another additional number of referrals. He gave up because no matter what I do, I'm never going to satisfy these people, which is the exact same case in that 4th District case that I mentioned previously. You don't have to be a perfect parent to parent. And just because you don't get along with DCFS does not mean that you're unfit. But in this particular case, I think that this- your court's decision is probably going to be the final decision. Thank you. Thank you very much. Okay, this case is an expedited appeal under Rule 306A5, and the decision will be issued within the next week or so. Okay, thank you, gentlemen, for your argument.